# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PATRICIA O'DEA-EVANS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 07-cv-674 |
| ) | |
| A PLACE FOR MOM, INC. ) | Judge Robert M. Dow, Jr. |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Patricia O'Dea-Evans ("O'Dea-Evans"), filed this lawsuit on February 5, 2007. Her complaint [1] comprises a single count and alleges violations of the Family and Medical Leave Act (29 U.S.C. § 2601 *et seq.*) (the "FMLA" or "Act"). The Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2).

O'Dea-Evans's complaint states that she was an employee of Defendant, A Place for Mom, Inc. (the "Company"), and that she requested one or two weeks of flexible scheduling to care for her son, who has Asperger's syndrome, and her mother, who has Parkinson's disease. The Company allegedly responded to the request by placing O'Dea-Evans on extended leave and then terminating her employment. The Company's Answer [84] generally denies O'Dea-Evans's allegations and states that its conduct did not violate the FMLA.

Before the Court is the Company's motion for summary judgment [85]. The Company contends that it is entitled to judgment as a matter of law because O'Dea-Evans is not an eligible employee within the scope of the FMLA's coverage. To be eligible, a plaintiff's employer must have at least 50 employees within 75 miles of the plaintiff's "worksite." For an employee who does not have a fixed worksite, a Department of Labor regulation specifies that the worksite is

the location from which the employee receives assignments or to which the employee reports. Because there are genuine issues of material fact concerning the location of O'Dea-Evans's worksite under the FMLA regulations, the Company's motion for summary judgment [85] is denied.

**I.     Facts**

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements: Defendant's Statement of Facts ("Def. SOF") [87], Plaintiff's Response to Defendant's Statement of Facts ("Pl. Resp. Def. SOF") [90], Plaintiff's Statement of Additional Facts ("Pl. SOAF") [91], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Pl. Resp. Def. SOAF") [101].[1]

   **A.     O'Dea-Evans's Work and Worksite**

The Company is an elder care referral service, headquartered in Seattle (the "Seattle office"). (Def. SOF ¶¶ 1, 33.) The Company provides information to families about nearby elder care options (*id.* ¶ 1) and gets paid a fee by the elder care facility that a family selects. (Pl. SOAF ¶ 6; Pl. Aff. ¶ 9.) As part of the operation, the Company employs "Advisors" (such as O'Dea-Evans) throughout the United States. (Def. SOF ¶ 2.) O'Dea-Evans held the position of

---

[1] L.R. 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. at 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider the statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317).

2

Advisor starting in March 2003 (*id.* ¶ 3) and was assigned to the Chicago region (*id.*; Pl. Resp. Def. SOF ¶ 4). She worked on a straight commission basis and the vast majority of her successful transactions were based on either "Internet leads"[2] routed from a computer server in Seattle or professional relationships that she cultivated in Illinois. (Def. SOF ¶ 8; Def. Resp. SOAF ¶ 5.)

The chief dispute between the parties pertains to whether the Seattle office was the place from which O'Dea-Evans received assignments, to which she reported, or both. Those questions, in turn, depend on the role that O'Dea-Evans's Market Development Coach ("Coach") played within the Company. At the time of O'Dea-Evans's termination, her Coach was Connie Adams, who works out of her home in Cookeville, Tennessee. (Def. SOF ¶ 25.) The Company marshals facts suggesting that Coaches exert considerable influence over an Advisor's day-to-day goings on. According to the Company, after five or six months of employment, an Advisor is assigned to a Coach[3] (like Connie Adams). (*Id.* ¶ 7.) These Coaches are, in essence, "regional managers." (Temple Dep. at 42.) For example, according to the Company's CEO, Pamala Temple ("Temple"), Adams "would come to Chicago on a regular basis and meet face to face with the advisors" and "would go out on sales calls with the advisors." (*Id*. at 81.) Adams also

---

[2] "Internet leads" are created from online assessment forms on the Company's website which are filled out by interested family members. (Temple Dep. at 22.) The parties dispute the extent of control exercised over the Internet leads by the Seattle office (compared with Coaches). O'Dea-Evans contends that the process was entirely automated or controlled by Seattle (Pl. SOAF ¶ 9); the Company contends that Coaches could adjust the workload of individual Advisors (Def. SOF ¶ 14). The underlying deposition testimony, provided by the Company's CEO, is unclear on the point and does not provide detail with respect to Connie Adams's actual conduct. (See Temple Dep. at 21-23, 38.) The same goes for Connie Adams's affidavit. (Adams Aff. ¶ 8.)

[3] According to the Company, Advisors also are assigned an interim coach immediately after attending an introductory three-day training session in Seattle. (Def. SOF ¶ 6.) The interim coaches are responsible for continued training. O'Dea-Evans, however, says that she was never appointed this type of coach. (Pl. Resp. Def. SOF ¶ 6.)

made sure that O'Dea-Evans met her quota (*id*. at 165); strategized with O'Dea-Evans (*id*. at 166); disciplined her (Adams Aff. ¶ 8); and told her that she was fired (Temple Dep. at 167).

O'Dea-Evans disputes the Company's version of the facts, relying primarily on her own affidavit and those of several former Advisors.[4] O'Dea-Evans's evidence suggests that Coaches play only a modest role in the work of Advisors. As an initial matter, Advisors were never informed that their Coaches were supervisors or managers. (Pl. Aff. ¶¶ 54-55; Watson Aff. ¶¶ 47-48.) Rather, Coaches were billed as "Sales Greatness Coaches," people who were available to assist the Advisors in generating ideas. (Pl. Aff. ¶ 55.) In 2004, experienced advisors were told that they would have no Coach (*id*. ¶ 50; Watson Aff. ¶ 47), and at one point O'Dea-Evans had a Coach who she did not even know about (Pl. Aff. ¶ 51). With respect to Connie Adams in particular, O'Dea-Evans says that her Coach never conducted "ride alongs" as Temple testified (Pl. SOAF ¶ 28(b)), that O'Dea-Evans and Adams spoke only every three or four weeks (*id.* ¶ 28(a)), and that the two did not meet in person unless there was a regional meeting that was run by the Seattle office (*id.* ¶ 28(c)). Although O'Dea-Evans concedes that Adams put her on a performance improvement plan and that Adams terminated her employment, she claims (citing temporal and language-based ambiguity in Temple's testimony) that Adams did not have discretion in taking either step. (Pl. Resp. Def. SOF ¶ 27(i).) "Coaches mainly collected and compiled data to submit to [the Seattle office]." (Watson Aff. ¶ 51.)

O'Dea-Evans also provides evidence that the Seattle office, rather than Connie Adams's residence, was the place from which she received assignments and to which she reported. She was interviewed and hired by corporate officers located in Seattle. (Pl. SOF ¶ 2; Def. SOF, Ex. 3-A). Seattle is also where training for new Advisors took place. (Watson Aff. ¶¶ 14-15.)

---

[4] The Company, in turn, disputes many of O'Dea-Evans's assertions, but at summary judgment the record is viewed in the light most favorable to the non-movant. Part II, *infra*.

4

O'Dea-Evans says that she and Temple were, for a time at least, in "frequent contact * * * several times a month to discuss contracts, marketing ideas, and tips on training new advisors." (Pl. Aff. ¶ 38.) During conference calls, Temple provided direction to Advisors (*id.* ¶ 11(e)), and Temple controlled the size of O'Dea-Evans's sales territory (*id.* ¶¶ 21-23). Finally, although a "typical sales transaction" included regular contact with the Seattle office (*id.* ¶ 68), Coaches played "no role" in completing sales (*id.* ¶ 69).

### B. O'Dea-Evans's Termination

At the time that O'Dea-Evans's employment was terminated, Adams was her Coach. (Def. SOF ¶ 23.) O'Dea-Evans was placed on extended leave after she sent an email on November 6, 2006, to Carroll Dale, a Coach who was substituting for Connie Adams. (*Id.* ¶¶ 32, 36.) In the email that O'Dea-Evans sent, she sought to have her schedule adjusted. (*Id.* ¶ 36.) The email stated, in part:

> I need to adjust my work schedule for the rest of this week and possibly next week. * * * [M]y Mom's (sic) full time caregiver quit and my son's Nanny (sic) decided she had to take care of last minute family business out of town for the next two weeks. I rapidly lost my entire support system in one day. * * * I have never had to ask for this type of help since I have started with [the Company] and I appreciate the flexibility of this position in times like this.

(*Id.*, Ex. 4-B.) The next day, Carroll Dale informed O'Dea-Evans that the latter was being placed on extended leave for approximately two weeks. (*Id.* ¶ 37.) When she tried to go back to work on November 15, 2006, O'Dea-Evans could not access the Company's systems. (Pl. SOAF, Ex. 5.) Her employment was terminated on December 1, 2006. (*Id.* ¶ 36.)

### C. The Number of Employees at the Proposed Worksites

The Company did not employ 50 or more advisors within 75 miles of Connie Adams's home or Carroll Dale's home when O'Dea-Evans was placed on extended leave. (Def. SOF ¶ 42, 43.) The Company states that fewer than 50 workers were employed within 75 miles of the

5

Seattle office – a conclusion which, for FMLA purposes, O'Dea-Evans denies. (Pl. Resp. Def. SOF ¶ 41.) Rather, O'Dea-Evans points to at least nine Advisors, nine Coaches, and four corporate officers who reported to Seattle. (Pl. SOAF ¶¶ 37, 39-40.) In addition, there were 29 employees physically located at or within 75 miles of the Seattle office. (*Id.* ¶ 38.) That yields a total of 51 employees. The Company, however, denies that the Advisors "reported to" Seattle. (Def. Resp. Pl. SOAF ¶ 37.)

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**III. Analysis**

The Company argues that it is entitled to judgment as a matter of law because the Act does not apply where an employer employs fewer than 50 employees within 75 miles of the employee's worksite: because the Company does not employ at least 50 people within 75 miles of Connie Adams's house, O'Dea-Evans is not an eligible employee under the FMLA. O'Dea-Evans counters that the Seattle office was her worksite and that numerous other Advisors reported to the Seattle office as well. Based on the record evidence and the summary judgment standard, the Court concludes that there are genuine issues of material fact that preclude summary judgment.

**A. The Family and Medical Leave Act**

The Family and Medical Leave Act allows an "eligible employee" to take a total of twelve weeks of leave per year "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Under the Act, leave to care for a sick loved one "may be taken intermittently or on a reduced leave schedule when medically necessary" and the employer may not reduce "the total amount of leave to which the employee is entitled * * * beyond the amount of the leave actually taken." 29 U.S.C. § 2612(b)(1). The employee returning from leave is entitled to return to the same position of employment or an equivalent. 29 U.S.C. § 2614. Further, the Act makes it unlawful for an employer to "interfere with, restrain, or deny" an employee's attempt to

7

exercise her FMLA rights or to discriminate against an employee who exercises her rights. 29 U.S.C. §§ 2615(a)(1)-(2). The Act's entitlements and prohibitions are accompanied by a statutory stick: an employer who violates the FMLA can be sued for lost compensation and statutorily calculated liquidated damages, and also may be subject to "appropriate" equitable relief. 29 U.S.C. § 2617.

The Act's protections do not extend to all workers, however. To qualify as an "eligible employee," an employee must have been employed by her employer for twelve months and have worked at least 1,250 hours in the previous twelve-month period. 29 U.S.C. §§ 2611(2)(A)(i)-(ii). In addition, and at the heart of the Company's summary judgment motion, the Act excludes certain small employers from the Act's reach: "The term 'eligible employee' does not include any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii). This is known as the 50/75 provision. The provision reflects the nuanced aims of the Act. Among the FMLA's enacted purposes were "to entitle employees to take reasonable leave * * * for the care of a child, spouse, or parent who has a serious health condition," but to do so "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2)-(3). Discerning the contours of the 50/75 provision requires an examination of the statute's implementing regulations.

### B. The Department of Labor's FMLA Regulations

The Act's 50/75 provision is not fully described by the statutory scheme. Particularly important for present purposes, the term "worksite" is not defined in the FMLA. Rather, the Department of Labor, acting pursuant to its rulemaking authority (29 U.S.C. § 2654), has defined the term:

> For employees with no fixed worksite, e.g., construction workers, transportation workers * * *, salespersons, etc., the "worksite" is the site [(1)] to which they are assigned as their home base, [(2)] from which their work is assigned, or [(3)] to which they report. * * * An employee's personal residence is not a worksite in the case of employees, such as salespersons, who travel a sales territory * * *. Rather, their worksite is the office to which they report and from which assignments are made.

29 C.F.R. § 825.111(a)(2) (2009) (emphasis added).[5] In keeping with Congress's intent, the regulatory scheme closely tracks the regulations defining a "single site of employment" under the WARN Act (which in some cases mandates advance notice for mass layoffs). See 60 Fed. Reg. 2180, 2189 (1995); *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 558 (6th Cir. 2006).

The parties apparently assume, and the Court concludes, that the definition of worksite promulgated by the Department of Labor is entitled to deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Where a statute's language is "either silent or unclear on the point at issue" the Court generally defers to an agency's exercise of delegated authority on that point: "It is not our role to determine the most appropriate interpretation of the statute, but simply to assess whether the regulation reflects a reasonable construction." *Khan v. United States*, 548 F.3d 549, 554-55 (7th Cir. 2008). Here, the Act includes a broad delegation of rulemaking authority to the Secretary of Labor, whom the Act directs to "prescribe such regulations as are necessary to carry out" the parts of the FMLA that are implicated by O'Dea-Evans's lawsuit. 29 U.S.C. § 2654. And the statutory scheme includes a gap, as it leaves the definition of "worksite" undefined. The Secretary closed the gap using notice and comment rulemaking, a strong

---

[5] The regulation was updated in January 2009; the minor updating and clarifications (to language that is not directly implicated here) do not affect the Court's analysis and do not present retroactivity issues in any event. *Cf. First Nat'l Bank of Chi. v. Standard Bank & Trust*, 172 F.3d 472, 478 (7th Cir. 1999) (reasoning that a "Clarifying Amendment" to a regulation did not present a question of retroactivity). See also *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 n.3 (1996) ("Where * * * a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means.").

indication that *Chevron* deference is appropriate. *United States v. Mead Corp.*, 533 U.S. 218, 228-29 (2001) ("the process of rulemaking" is "a very good indicator of delegation meriting *Chevron* treatment"); see also 60 Fed. Reg. at 2188-89 (detailing the rulemaking process for Section 825.111); 73 Fed. Reg. 7876, 7883-84 (2008) (same). Therefore, deference is appropriate. *Grace v. USCAR*, 521 F.3d 655, (6th Cir. 2008) ("Courts have consistently applied the Department of Labor regulations when addressing questions about FMLA leave."); *Hackworth v. Progressive Casualty Ins. Co.*, 468 F.3d 722, 726-27 (10th Cir. 2006); *Killion v. Hospira Worldwide, Inc.*, 2009 WL 249357, at *1 (S.D. Ill. Feb. 3, 2009); see also *Meson v. GATX Tech. Svcs. Corp.*, 507 F.3d 803, 808-09 (4th Cir. 2007) (*Chevron* deference to similar regulations promulgated under the WARN Act). But see *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1019 (7th Cir. 2000) (Evans, J., dissenting) (suggesting that the majority did not accord *Chevron* deference to FMLA regulations).

Even according deference to a regulation, one must still apply it. Section 825.111(a)(2) sets out three bases for determining whether a given location qualifies as an employee's FMLA worksite: a location qualifies if it is (1) her home base; (2) the location from which she receives assignments; or (3) the location to which she reports. Both parties, citing the district court's opinion in *Cialini v. Nilfisk Advance Am., Inc.*, say that the regulation sets out a disjunctive test – so long as an employee can establish one of the regulatory prongs, she can claim a given worksite. See 2000 WL 230215, at *4 (E.D. Pa. Feb. 28, 2000). The *Cialini* Court relied primarily on the plain language of Section 825.111 and on an earlier Third Circuit case addressing the definition of "single site of employment" under the WARN Act regulations. *Id.* (quoting *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139 (3d Cir. 1998) and noting the substantial identity of language between the WARN Act and FMLA regulations). Of

10

course, a district court's decision is not precedential. *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007). Yet, whether Section 825.111 sets out a disjunctive test, conjunctive test, or "factors" for courts to consider (*cf. Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 558 (6th Cir. 2006)),[6] denial of the Company's summary judgment motion is appropriate.

When interpreting the individual prongs themselves – *i.e.*, fixing the location of an employee's home base, or the location from which she receives assignments or to which she reports – the analysis turns on the *substance* of the underlying employee-employer-worksite interaction, rather than its form.[7] The goal is to locate the "engine * * * [of] activity." *Cf. Ciarlante*, 143 F.3d at 147 (quoting a worker's declaration that was offered as evidence). For example, in *Cobb* the Court concluded that even though the plaintiff-truck-driver departed from and returned to the same truck stop, the location was merely "a glorified gas station, over which Defendant ha[d] no authority or control" and therefore was not the plaintiff's home base. 452 F.3d at 559. Similarly, in fixing the location from which a worker receives assignments, courts

---

[6] Despite some inconsistent phrasing within Section 825.111(a)(2), the Court notes that several circuits have interpreted "single site of employment" under the WARN Act as setting out a disjunctive test, indicating that the same conclusion applies to Section 825.111. See, *e.g.*, *Ciarlante*, 143 F.3d at 145 (reasoning that, because the related WARN Act provision was worded in the disjunctive, the WARN Act applied "[i]f any one of [the] three inquiries [could] be answered in the affirmative"); *Teamsters Local Union 413 v. Driver's Inc.*, 101 F.3d 1107, 1110 (6th Cir. 1996) (same); *Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 819 (9th Cir. 2007) (citing *Driver's* and employing its framework although doing so in the alternative and not clearly endorsing the disjunctive interpretation). The Court is not aware of contrary authority, and the disjunctive reading can be read consistently with other parts of the regulatory scheme. The posture of the case, arguments of the parties, and state of the record, however, do not require the Court to explore the issue in any depth.

[7] The general approach of looking to substance over form makes sense: a meaningful look at substance ensures that Congress's intent in enacting the FMLA is not thwarted by, for example, an organizational chart that fails to reflect an employer's actual operations. *Cf. Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics*, 510 F.3d 681, 686 (7th Cir. 2007) (substance over form in Eleventh Amendment immunity analysis); *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 612 (7th Cir. 2005) (substance controls whether a contract is a lease or security agreement); *Grojean v. C.I.R.*, 248 F.3d 572, 576 (7th Cir. 2001) (same, in federal tax law); *Freedom from Religion Found., Inc. v. City of Marshfield, Wis.*, 203 F.3d 487, 491 (7th Cir. 2000) (same, in an Establishment Clause case; "adherence to a formalistic standard invites manipulation").

have focused on "the source of day-to-day instructions * * * distinguish[ing] the true source of instructions from mere conduits through which the instructions passed." *Cialini*, 2000 WL 230215, at * 4 (quoting *Ciarlante*, 143 F.3d at 147); see also *Connors v. SpectraSite Commc'ns, Inc.*, 465 F. Supp. 2d 834, 850-52 (S.D. Ohio 2006). And to fix the location to which an employee reports, courts have focused on the location of personnel who "were primarily responsible for reviewing" the employee's work product in order to collect data, track employee performance, "develop new sales strategies, and the like." *Cialini*, 2000 WL 230215, at *4. Other factors may bear on the analysis, because the worksite inquiry often is fact specific. *Podkovich v. Glazer's Distribs. of Iowa, Inc.*, 446 F. Supp. 2d 982, 1001 (N.D. Iowa 2006).

### C. Application

The Company argues in its summary judgment motion that O'Dea-Evans's case fails as a matter of law because she is not an eligible employee. The parties agree that O'Dea-Evans's residence cannot be her home base. 29 C.F.R. 825.111(a)(2) ("An employee's personal residence is not a worksite in the case of employees * * * who travel a sales territory * * *."). Therefore the only parts of the regulation at issue are (i) the location from which O'Dea-Evans received her assignments and (ii) the location to which O'Dea-Evans reported. O'Dea-Evans has provided support for her contention that the Seattle office was the location for both.

O'Dea-Evans has presented evidence that would allow a finder of fact to conclude that that her day-to-day assignments came from Seattle. CEO Temple provided directions to Advisors during conference calls (Pl. Aff. ¶ 11(e)). And, critically, the evidence regarding Adams's involvement in managing Internet leads is both disputed and unclear, and Temple's deposition testimony speaks in general terms about the role of Coaches in managing Internet leads rather than providing concrete facts about Connie Adams's role. (See *supra* note 2.)

Summary judgment requires a court to look at the record evidence in the light most favorable to the plaintiff. Based on that evidence, and viewed through the summary judgment prism, a finder of fact could conclude that Adams's role in assigning work was essentially ministerial, particularly given that O'Dea-Evans had no Coach at one point and at another point she had a Coach of whose existence she remained ignorant. (Pl. Aff. ¶¶ 50-51.) Moreover, multiple former Advisors submitted affidavits indicating that they were in only limited contact with their Coaches about work assignments. (See, *e.g.*, Watson Aff. ¶ 53). If O'Dea-Evans's assignments were piped in from Seattle and all that Adams did in Tennessee was occasionally tighten or loosen the spigot, then a fact finder could conclude that the real source of assignments was the Seattle office. In any event, because there is a triable issue on the question, summary judgment cannot be granted. See also *Killion*, 2009 WL 249357, at *3 & n.1 (denying summary judgment in an FMLA case because of disputed facts about the employee's worksite); *Leverne v. Shelby Group Int'l, Inc.*, 2005 WL 3071889, at *3-5 (W.D. Tenn. Nov. 14, 2005) (same); *Collinsworth v. Earthlink/Onemain, Inc.*, 2003 WL 22916461 (D. Kan. Dec. 4, 2003) (same).

The same conclusion applies with respect to the record evidence on the location to which O'Dea-Evans reported. O'Dea-Evans offers evidence that a Coach's primary role was merely to aggregate data rather than supervise the Advisors. (Watson Aff. ¶ 51.) Routine sales transactions involved repeated interaction with the Seattle office but no interaction with Coaches. (Pl. Aff. ¶¶ 68-69.) O'Dea-Evans also refutes the Company's characterization of extensive supervisory involvement by Coaches, stating that her training took place in Seattle, she had little contact with Adams and that the latter did not conduct ride alongs with O'Dea-Evans. See *Podkovich v. Glazer's Distribs. of Iowa, Inc.*, 446 F. Supp. 2d 982, 1002 (N.D. Iowa 2006) (summary judgment inappropriate where plaintiff presented evidence that her training, job

assignments, and authorizations came from Des Moines). Moreover, Temple was unsure in her deposition testimony the extent to which Adams monitored O'Dea-Evans's performance. (Temple Dep. at 82.) Although the Company has offered evidence that, if credited, supports its position – such as Adams's involvement in disciplining and ultimately terminating O'Dea-Evans (*id*. at 165) – credibility disputes create "a singularly inappropriate time" for granting summary judgment. *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 340 (7th Cir. 2001).

The analysis does not end there, however. The Company contends that even assuming that O'Dea-Evans can show that the Seattle office was *her* worksite, the Company did not employ 50 or more employees within 75 miles of the Seattle office. The Company admits that four corporate officers and nine coaches reported to the Seattle Office. (Def. Resp. Pl. SOAF ¶¶ 39-40.) Combined with the 29 employees that the Company admits were physically located at or within 75 miles of the Seattle office (*id.* ¶ 38), this yields a total of 42 employees, 43 if O'Dea-Evans is included. The flaw in the Company's argument is that the evidence that O'Dea-Evans presents outstrips the concessions that the Company is willing to make: the affidavits of multiple Advisors say that more than 100 Advisors received assignments from and reported to the Seattle office. (See, *e.g.*, Burdo Aff. ¶¶ 4-5). The facts, therefore, are far different from those dealt with by Judge Norgle in the *Mason* case, which the Company cites; its analysis is inapposite. See *Mason v. United Food and Commercial Workers Int'l Unions*, 2006 WL 644028 (N.D. Ill. March 7, 2006). O'Dea-Evans needed to raise a genuine issue of material fact with respect to 8 Advisors; she has done so with respect to 100.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [85] is denied.

Dated: July 15, 2009

Robert M. Dow, Jr.
United States District Judge